## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| YEETA L. WARD, | ) |
| Plaintiff, | ) |
| v. | ) Civil Action No. 10-0321 (ABJ) |
| DISTRICT OF COLUMBIA, | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

In this action, plaintiff Yeeta Ward alleges that the District of Columbia violated Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"), and the Civil Rights Act of 1991, 42 U.S.C. § 1981 ("Section 1981"), by subjecting her to a hostile work environment on the basis of her gender and in retaliation for filing complaints with management about the alleged discrimination and retaliation.  Presently before the Court is the District's motion for summary judgment.  Because Ward has failed to come forward with sufficient evidence for a reasonable jury to find that she suffered severe or pervasive hostility on the basis of either gender or retaliation, the Court will grant the District's motion.

## BACKGROUND

Ward was hired by the District of Columbia Department of Youth Rehabilitation Services ("DYRS") as a Youth Correctional Officer in 2004.  Pl.'s Opp. to Def.'s Mot. for Summ. J. ("Pl.'s Opp.") [Dkt. # 38] at 10.  She has submitted portions of her own deposition and answers to the District's interrogatories, in which she states that while working at the metal detector at a DYRS facility on two occasions in December 2005, she was subjected to sexually suggestive

comments by her supervisor at the time, Chief of Detained Services Jeffrey McInnis.  Pl.'s Dep. [Dkt. # 38-1] at 44:6–45:12; *see also* Pl.'s Answers to Def.'s Interrogs. to Pl. ("Pl.'s Answers to Interrogs.") [Dkt. # 38-15] at 2.  She claims that on the first occasion, when McInnis triggered the metal detector, he told her: "[I]t must be the metal in my drawers."  Pl.'s Dep. at 44:20–45:3; Pl.'s Answers to Interrogs. at 3.  The second time, he allegedly told her:  "I want you to use your hands and pat me down."  Pl.'s Dep. at 45:9–:13; Pl.'s Answers to Interrogs. at 3.

According to Ward, she spoke to the Chief of Staff, Michael Watts, and complained about McInnis's comments in the month that they occurred.  Pl.'s Answers to Interrogs. at 2. Yet, she was kept under McInnis's supervision for another approximately three years.  Pl.'s Dep. at 63:10–:14, 64:14–:16.

Ward claims that after complaining to Watts, she began to experience negative treatment by her chain of command, and that the treatment intensified as she made more complaints about the discrimination and retaliation that she was allegedly experiencing.  Pl.'s Answers to Interrogs. at 11.  She claims that she complained about discrimination and retaliation to Nathaniel Williams (then Acting Superintendent), Mark Schindler (then General Counsel or Chief of Staff), Vincent Schiraldi (then Director of DYRS), David Brown (then Deputy Director of DYRS), Neal Stanley (current Director of DYRS), and Carol Godley (Human Resources Director).  Pl.'s Dep. at 98:16–18, 101:10–:16; Pl.'s Answers to Interrogs. at 11.

Ward also claims that during the five years after she complained to Watts, she experienced a number of negative events:

- Beginning in July 2006, Sharon White-Pulley, the watch commander in charge of Ward's command, allegedly regularly insulted Ward by referring to her as "baldy," "mini-me," and "big mouth."[1]

- At some point in 2007 or 2008, Ward allegedly applied for and was denied a promotion to Lead Correctional Officer.[2]

- Ward was allegedly reassigned within DYRS in June 2007, November 2007, December 2007,[3] January 2008, and October 2009.[4]

- Ward's managers allegedly did not provide her with sufficient support or training in her jobs.[5]

---

1    Pl.'s Dep. at 113:9–119:15; Pl.'s Answers to Interrogs. at 3; *see also* Email from Angela Burns to Keith Wheeler (July 6, 2006), Ex. 3 to Pl.'s Opp. (reporting that during a conversation, White-Pulley repeatedly referred to Ward "mini me," put her down, and "made it very clear that she and Mrs. Ward do not get along"); Email from Veronica Joyner to Nathaniel Williams (Nov. 7, 2006), Ex. 4 to Pl.'s Opp. (complaining about White-Pulley and reporting that White-Pulley called Ward "bald-head Ms. Ward").

2    Pl.'s Dep. at 104:19–110:3; Def.'s Answers to Pl.'s First Set of Interrogs. ("Def.s' Answers to Interrogs."), Ward Aff., Ex. 5 to Pl.'s Opp. [Dkt. # 38-5] ¶¶ 8–10 (stating that she was qualified for a promotion to the position of Lead Correctional Officer in March 2007); Ex. H to Def.'s Mot. for Summ. J. ("Def.'s Mot.") [Dkt. # 35] at 8 (acknowledging that plaintiff was not promoted to Lead Corrections Officer, but stating that she was not promoted because she did not qualify for the promotion); Ex. I to Def.'s Mot. (verifying that plaintiff applied for the Lead Corrections Officer position on November 10, 2008).

3    Defendant also mentions a reassignment in October 2007.  *See* Def.'s Mem. at 11. However, the documents it cites to explain the reason for the reassignment – emails between Ward and Vincent Schiraldi, Ex. D. To Def.'s Mot, – describe the reassignment as taking place in December 2007, not in October.

4    Memorandum from Nathaniel Williams to Yeeta Ward (June 28, 2007), Ex. B to Def.'s Mot. (Notice stating that plaintiff would be detailed to the At Risk Unit for no more than thirty days pending the outcome of an investigation into allegations that Ward made threats against another employee; Emails between Yeeta Ward and Vincent Schiraldi, Ex. D to Def.'s Mot. (concerning Ward's reassignment from the front desk on November 14, 2007); Memorandum from Keith Wheeler to Yeeta Ward (Nov. 14, 2007), Ex. F to Def.'s Mot. (stating that Ward's schedule would be changed "in order to satisfy the needs" of the DYRS); Memorandum from Fred Williams to Yeeta Ward (Dec. 14, 2007), Ex. G to Def.'s Mot. (reassigning Ward to the New Beginnings Team "[i]n order to satisfy the needs" of the DYRS); Email from Yeetta Ward to Vincent Schiraldi (Oct. 20, 2009), Ex. 12 to Pl.'s Opp. (complaining about a reassignment on October 20, 2009).

- In November 2007, and on other unspecified occasions, security officers allegedly escorted Ward from DYRS.[6]

- In July 2008, despite being restricted to an eight-hour workday by her physician, Ward was allegedly required to work for periods longer than eight hours.[7]

- Fred Williams – one of Ward's supervisors – allegedly denied Ward lunch and bathroom breaks during at least one shift.[8]

- Ward allegedly was not given overtime assignments even though DYRS's Risk Manager for the Light Duty Program determined in January 2008 that she was fit to work overtime on her days off.[9]

---

[5]     Pl.'s Dep. at 150:12–151:10 (stating that her manager at the time, Charlotte Richardson, assigned the worst kids to the unit that she was assigned to work), 174:18–:20 (stating that at some point she was not provided assistance that she requested in order to break up fights among kids), 174:22–175:13 (stating that at some point she was required to do a job alone that required two or three people).

[6]     Pl.'s Dep. at 137:9–139:20 (stating that she was escorted out of the building multiple times and recalling that in one instance she was escorted out of the building "because they said that I refused to speak to Mr. Mark Schindler"); 151:11–152:3 ("[Mr. Schindler] had me humiliated, escorted out of the building for what he alleged that I did not speak to him.").

[7]     Pl.'s Dep. at 102:6–:12 (stating that physician advised her against working more than an eight-hour day), 103:20–104:12 ("Q:  . . . [I]s it your allegation that you were ever forced to work for more than eight hours against your doctor's recommendation?  A: Yes, it was.  Q: On how many occasions?  A:  I don't recall at this time."), 160:17–161:8 (stating that Fred Williams required Ward to work more than eight hours during a shift); Doctor's note, Ex. L to Def.'s Mot. (doctor's note stating "Ms. Yeetta Ward is currently under medical supervision and should not be working more than an 8 hour day"); Memorandum from Fred Williams to Yeeta Ward (Jan. 16, 2008), Ex. 7 to Pl.'s Opp. (requesting that Ward meet with a risk manager for an assessment for the Light Duty Program based on the medical documentation that she provided to Human Resources stating that she was unable to work more than an eight-hour tour of duty), Email from Julian Muhammad to Fred Williams (Jan. 17, 2008), Ex. 9 to Pl.'s Opp. (email from Risk Manager stating that Ward could return to work regular work schedule and assignment, but is restricted to only eight hours).

[8]     Pl.'s Dep. at 160:11–161:8 (describing one instance when Mr. Williams would not relieve Ward of her duty so that she could take a bathroom break), 174:15–:22 ("There's a lot of ways . . . that I've been subjected to.  The not giving me a lunch break at my request. . . . The not allowing me to go to the bathroom.").

Ward filed a formal Charge of Discrimination with the D.C. Office of Human Rights and the Equal Employment Opportunity Commission ("EEOC") on March 17, 2008, in which she charged DYRS with unlawful discrimination on the basis of gender, retaliation, and political affiliation (Fraternal Order Police).  Ex. R to Def.'s Mot.  The charge stated:  "I feel like I am being retaliated against for my political affiliation (Fraternal Order) and my sexual harassment complaint that I reported back in December 2005."  *Id.* at 2.

Ward filed her original complaint against the DYRC in this Court on February 26, 2010. Compl. [Dkt. # 1].  The original complaint contained one count of retaliation and one count of hostile work environment based on gender under Title VII, the District of Columbia Human Rights Act ("DCHRA"), and Section 1981.  *Id.* ¶¶ 24–49.  The DYRC moved to dismiss, arguing that the District of Columbia was the proper defendant and that Ward was precluded from bringing claims under the DCHRA under the election of remedies doctrine.  Def.'s Mot. to Dismiss [Dkt. # 4] at 1.  The Court granted the motion part and denied it in part.  Mem. Op. and Order [Dkt. # 13] at 6–7.  It dismissed Ward's DCHRA claims, and substituted the District of Columbia for the DYRC as the defendant in this action for purposes of the remaining claims.  *Id.* At a status hearing on June 20, 2011, Ward, through counsel, made an oral motion for leave to file an amended complaint, which the Court granted.  *See* Minute Entry (June 20, 2011).  Ward filed her amended complaint on June 27, 2011.  Am. Compl. [Dkt. # 21].  Count I asserts a claim for hostile work environment on the basis of retaliation, in violation of Title VII and Section

---

9       Pl.'s Dep. at 80:17–81:3, 104:19–:22; Email from Julian Muhammad to Fred Williams (Jan. 17, 2008), Ex. 9 to Pl.'s Opp. (stating that Ward was restricted to only eight hours of work but "isn't precluded from working her days off."); Memorandum from Yeeta Ward to David E. Brown (Feb. 18, 2007), Ex. K to Def.'s Mot. (complaining that her team leader Linda Holmes would not allow her to work an overtime shift, and stating that she was aware of other correctional officers who were permitted to work overtime shifts).

1981.  *Id.* ¶¶ 43–58.  Counts II and III both assert claims for hostile work environment on the basis of gender in violation of Title VII and Section 1981.[10]  *Id.* ¶¶ 59–92.

## STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The party seeking summary judgment bears the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).  To defeat summary judgment, the non-moving party must "designate specific facts showing that there is a genuine issue for trial."  *Id.* at 324 (internal quotation marks omitted).  The existence of a factual dispute is insufficient to preclude summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  A dispute is "genuine" only if a reasonable fact-finder could find for the non-moving party; a fact is only "material" if it is capable of affecting the outcome of the litigation.  *Id.* at 248; *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987).  In

---

10      The "jurisdiction" section of the amended complaint also cites the DCHRA as one of the bases for the Court's jurisdiction.  Am. Compl. ¶ 1.  However, since the Court dismissed plaintiff's DCHRA claims from the original complaint based on election of remedies, Mem. Op. and Order [Dkt. # 13] at 4–5, and that deficiency has not been cured in the amended complaint, the Court will treat any claims raised under the DCHRA as dismissed.  Moreover, the Court may also properly treat any claim asserted in the amended complaint under the DCHRA as waived because none of the individual counts in the amended complaint invoke the DCHRA and plaintiff does not argue in her opposition to the motion for summary judgment that any claim under the DCHRA should survive summary judgment.  *See Grenier v. Cyanamid Plastics, Inc.*, 70 F.3d 667m 678 (1st Cir. 1995) ("Even an issue raised in the complaint but ignored at summary judgment may be deemed waived."); *Styrene Info. and Research Ctr. v. Sebelius*, -- F. Supp. 2d --, Civ. A. No. 11-1079, 2013 WL 1984235, at *11 (D.D.C. May 15, 2013) (deeming a claim that plaintiffs did not raise in their summary judgment briefs to be abandoned).

assessing a party's motion, the court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the summary judgment motion.'"   *Scott v. Harris*, 550 U.S. 372, 378 (2007) (alterations omitted), quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam).

## ANALYSIS

Title VII prohibits the District of Columbia from discriminating on the basis of race, gender, or national origin.   *See* 42 U.S.C. § 2000e-16(a).[11]   It also prohibits employer retaliation when an employee has "opposed any practice made an unlawful employment practice by this subchapter[.]" *id.* § 2000e-3(a).

### I.      Ward's retaliation hostile work environment claim fails as a matter of law.

Count I of the amended complaint alleges that the District unlawfully subjected Ward to a hostile work environment in retaliation for her complaints to management.   Am. Compl. ¶ 46. Title VII retaliation claims are evaluated under the framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 792 (1973).   *See Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009).   Under the *McDonnell Douglas* framework, a plaintiff bears the burden of making a *prima facie* showing of retaliation.   *Id.*   Once that showing has been made, the burden shifts to the defendant to produce a "legitimate, nondiscriminatory reason" for its actions.   *Id.* (internal quotation marks omitted).   If the employer makes this showing, then "the burden-shifting framework disappears," *Carter v. George Washington Univ.*, 387 F.3d 872, 878 (D.C. Cir.

---

11      Although Ward cites Section 1981 as a statutory basis for her claims, Section 1981 is not applicable here because it only prohibits discrimination on the basis of race, *see Ayissi v. Fannie Mae*, 712 F.3d 572, at n.1 (D.C. Cir. 2013), and Ward does not claim that she was discriminated against on the basis of her race.   Accordingly, to the extent that Ward's claims arise under Section 1981, the Court will grant summary judgment for the District.

2004), and the question before the court is "whether a reasonable jury could infer . . . retaliation from all the evidence[.]"  *Id.*

In order to make a *prima facie* showing of retaliation, plaintiff must show that (1) he engaged in protected activity; (2) he suffered an adverse employment action; and (3) there is a causal connection between the protected activity and the adverse action.  *Jones*, 557 F.3d at 677; *see also Taylor v. Solis*, 571 F.3d 1313, 1320 n.* (D.C. Cir. 2009).   At the summary judgment stage, however, if the employer produces a legitimate nondiscriminatory reason for its actions, "'the district court need not – *and should not* – decide whether the plaintiff actually made out a prima facie case under *McDonnell Douglas*.'"  *Jones*, 557 F.3d at 678, quoting *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008).  The central question becomes whether the plaintiff produced evidence sufficient for a reasonable jury to find that the employer's stated reason for the adverse action was not the actual reason and that the employer actually retaliated against the plaintiff for engaging in protected activities.  *See Brady*, 520 F.3d at 495.   In assessing this question, the court considers "all the evidence, which includes not only the prima facie case but also the evidence the plaintiff offers to attack the employer's proffered explanation for its action and other evidence of retaliation."  *Jones*, 557 F.3d at 677 (internal quotation marks and citations omitted).

To make out a hostile work environment claim, a plaintiff must demonstrate that the "workplace is permeated with discriminatory intimidation, ridicule, and insult" and that this behavior is "sufficiently severe or pervasive [as] to alter the conditions of the victim's employment and create an abusive working environment."  *Harris v. Forklift Sys.*, 510 U.S. 17, 21 (1993) (internal quotation marks omitted).  To determine "whether an actionable hostile work environment claim exists, [courts] look to 'all the circumstances,' including 'the frequency of the

discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002), quoting *Harris*, 510 U.S. at 23; *see also Baloch v. Kempthorne*, 550 F.3d 1191, 1201 (D.C. Cir. 2008). This standard "ensure[s] that Title VII does not become a general civility code" that involves courts in policing "the ordinary tribulations of the workplace." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788, (1998) (internal citation and quotation marks omitted).[12]

The acts that Ward claims contributed to her hostile work environment are:

1) She was reassigned to different facilities on at least four occasions between June 2007 and January 2008, and in October 2009.

2) Security officers escorted her from DYRS premises.

3) She was required to work shifts longer than eight hours in July 2008 despite a doctor recommendation that she should be restricted to an eight-hour limit.

4) Her managers did not provide her with overtime work.

5) She did not receive adequate support staff and resources.

6) She was denied lunch breaks and bathroom breaks.

7) She was denied a promotion to Lead Correctional Officer.

8) Her supervisor, Sharon White-Pulley, called her demeaning names.

9) The agency failed to remove her from McInnis's supervision for approximately three years after she complained that he had sexually harassed her;

---

12    There is some disagreement in this district about whether a hostile work environment claim should be assessed using the modified *McDonnell Douglas* burden-shifting framework or using a totality of the circumstances test. *Compare Bergbauer v. Mabus*, -- F. Supp. 2d --, Civ. A. No. 09-1023, 2013 WL 1245944, at 8 n.13 (D.D.C. 2013) (applying totality of the circumstances test) *to Baloch v. Norton*, 355 F. Supp. 2d 246, 259 (D.D.C. 2005) (applying *McDonnell Douglas*).   Ward's claim, however, fails under either framework because she has failed to produce sufficient evidence for a reasonable jury to find that the reason for her managers' actions was retaliation for her protected activities.

*See* Pl.'s Opp. at 20–23.

It is worth noting that some of these allegations – that Ward was escorted from DYRS premises on multiple occasions, that she was denied lunch breaks and bathroom breaks, and that she was not provided adequate support – are based entirely on allegations made by Ward during her deposition and in her affidavit.   *See* Pl.'s Opp. at 21–22.[13]   Ward does not provide timeframes for or contextual information about any of these alleged actions, and they are not corroborated by any other evidence.

Moreover, Ward's claim that in July 2008 she was required to work shifts longer than eight hours – and up to sixteen hours – during the time that her doctor prescribed a maximum eight-hour work day is founded entirely on her own deposition testimony and answers to interrogatories, despite payroll records submitted by the District that show the longest time period that Ward worked during July 2008 was just over eight and a half hours.[14]   *See* Pl.'s

---

13   To support her allegation that she was escorted from DYRS premises on multiple occasions, she relies solely on two statements from her own deposition. *See* Pl.'s Dep. at 137:9–139:20 (stating that she was escorted from the building on one occasion for not speaking to Mr. Schindler); *id.* at 136:16–:21 (stating that she had been escorted from the building "too many [times] to count").   Similarly, her claim that she was denied lunch breaks and bathroom breaks during a sixteen-hour shift is founded entirely on two assertions in her deposition.   Pl.'s Dep. at 161:3–:8 (alleging that Fred Williams "wouldn't allow them to relieve me for a break.   I didn't have a bathroom break; I had to go to the rest room.   I had kept calling for someone to let me go to the rest room; he wouldn't let them relieve me or anything . . . ."); *see also id.* at 174:17–18, 174:21–:22 (stating that one of the ways she was subjected to a hostile work environment was "[t]he not giving me a lunch break at my request," and "[t]he not allowing me to go to the bathroom").   Plaintiff's claim that she was not provided adequate support is also founded entirely on vague deposition testimony.   *See* Pl.'s Dep. at 150:12–151:10 (stating that her manager at the time, Charlotte Richardson, assigned the worst kids to the unit where she was assigned to work), 174:18–:20 (stating that at some point she was not provided assistance that she requested in order to break up fights among kids), 174:22–175:13 (stating that at some point she was required to do a job alone that required two or three people).

14   On July 27, 2008, plaintiff clocked in at 5:53am and clocked out at 3:24pm.   Ex. J to Def.'s Mot. at 43.   With a one hour lunch break, those times indicate a work day of eight hours and thirty-one minutes.

Response to Def.'s Statement of Undisputed Material Facts, pp. 10–17 of Pl.'s Opp. at 13–14; Ex. J to Def.'s Mot. at 43; Pl.'s Answers to Interrogs. at 5 ("She informed me that Mr. Fred Williams stated that I was not exempted from the draft, which left me to work 16 hours on the day in question.  At this time, I do not know the exact dates and time; however, my time and attendance records, which are in my employer's possession, would reflect it."). These self-serving assertions are not sufficient to create an issue of material fact.  *See Fields v. Office of Johnson*, 520 F. Supp. 2d 101, 105 (D.D.C. 2007) ("Self-serving testimony does not create genuine issues of material fact, especially where that very testimony suggests that corroborating evidence should be readily available."); *Gen. Elec. Co. v. Jackson*, 595 F. Supp. 2d 8, 36 (D.D.C. 2009) (stating that when a "declaration is self-serving and uncorroborated" it is "of little value at the summary judgment stage.").   Relying on the remaining actions that Ward points to as retaliatory – actions taken by a variety of different individuals over a five-year period – it would be a strain to find a workplace permeated with severe or pervasive treatment that altered the conditions of Ward's workplace.  *See Faison v. Vance-Cooks*, 896 F. Supp. 2d 37, 65–66 (D.D.C. 2012) ("Where, as here, a plaintiff adopts a 'kitchen sink' approach to crafting a hostile work environment claim, the Court can only conclude that these acts are so different in kind and remote in time from one another that they cannot possibly comprise part of the same hostile work environment.").

Moreover, the District has provided legitimate nondiscriminatory reasons for reassigning Ward and for denying her the promotion she sought, and Ward has not submitted any evidence that would demonstrate that those reasons are pretextual.   The District has submitted a memorandum from June 2007, which explains that Ward was temporarily reassigned to a new post for thirty days at that time so that DYRS could investigate a complaint that Ward had

threatened another employee.  Ex. B to Def.'s Mot.  Upon completion of the investigation, which was inconclusive, Ward was reassigned back to her post.  Ex. C to Def.'s Mot.  According to emails between Ward and Schiraldi in December 2007, Ward was reassigned away from the front desk because of poor interpersonal skills and her failure to speak to DYRS administrators. Ex. D. to Def.'s Mot.  And, according to memoranda from November 2007 and December 2007, Ward was reassigned in November 2007 and January 2008 to serve the needs of the DYRS.[15] Exs. F, G to Def.'s Mot.  As to the failure to promote Ward to the position of Lead Correctional Officer, the District explains that Ward – a Grade 6 at the time of her application for the promotion – was not qualified for a Grade 9 position.  Def.'s Answers to Interrogs., Ex. H to Def.'s Mot. at 8; Pl.'s Employment Application, Ex. I to Def.'s Mot.

Although Ward claims that the real reason for these actions was retaliation for the complaints she had made to her chain of command, she does not provide any evidence to show that the District's justifications are mere pretext and that the real motive for her managers' actions was retaliation.  As to the December 2007 reassignment away from the front desk, she claims that she did not demonstrate poor interpersonal skills, but the testimony from her own deposition that she cites in support of her argument does not actually contradict the District's justification.  *Compare* Email from Vincent Schiraldi to Yeeta Ward (Dec. 17, 2007), Ex. D to Def.'s Mot. (explaining that Ward was moved from the front desk at Schiraldi's request because when he and other DYRS employees "enter and leave the facility and say a simple 'hello' or 'good morning' to you, you fail to respond" and stating that "[i]t is inappropriate for the Director of the Agency and other DYRS staff to enter their place of work, sometimes in the presence of

---

15      The Court notes that defendant does not address Ward's October 2009 reassignment.  *See* Ex. 12 to Pl.'s Opp.  However, that omission is not significant because the Court finds that plaintiff has not demonstrated retaliatory motive for any of the employment actions she complains of.

members of the public, and to politely say good morning to front desk agency personnel, and to receive no response") *with* Pl.'s Dep. at 152:16–157:10 (testifying that Shiraldi's allegations were false because *on one occasion* she "acknowledged [Schindler's] presence by nodding with [her] head").

As to the failure to promote, Ward claims that "[h]aving been detailed into [the Lead Correctional Officer] position for one consecutive year, I should have been giv[en] the position without further competition."  Pl.'s Aff., Ex. 5 to Pl.'s Opp. [Dkt. # 38-5] ¶ 10.  According to Ward's affidavit, she knows that to be true because she trained new employees about DYRS operating procedures for four years.  *See id.* ¶ 13.  However, she submits no evidence that company policy dictates that outcome other than her own hearsay.  *See Slate v. Am. Broadcasting Cos., Inc.*, -- F. Supp. 2d --, Civ. A. No. 09-1761, 2013 WL 1734312, at *10 (D.D.C. Apr. 23, 2013), quoting *Akridge v. Gallaudet Univ.*, 729 F. Supp. 2d 172, 183 (D.D.C. 2010) ("[A] non-movant's allegations that are 'generalized, conclusory and uncorroborated by any evidence other than the [non-movant's] own deposition testimony' are 'insufficient to establish a triable issue of fact' – at least where the nature of the purported factual dispute reasonably suggests that corroborating evidence should be available.").

Moreover, the central problem with Ward's claim is that she does not show any linkage at all between the employment decisions to which she objects and her protected activities:  in other words, there is no evidence of a retaliatory motive.  "Title VII only prohibits retaliation against an employee that is taken 'because' the employee has engaged in protected activity."  *Mason v. Geithner*, 811 F. Supp. 2d 128, 179 (D.D.C. 2011), *affirmed*, 492 Fed. Appx. 122 (D.C. Cir. 2012) (per curiam).  Thus, "the plaintiff must establish a causal connection between the harassment and her protected activity to succeed on the claim."  *Lewis v. District of Columbia*,

653 F. Supp. 2d 64, 81 (D.D.C. 2009).   "There is an evidentiary component to this principle: evidence that bears no connection to the plaintiff's protected status cannot support a hostile work environment claim."   *Mason*, 811 F. Supp. 2d at 179, citing *Harris v. Wackenhut Servs., Inc.*, 419 Fed. Appx. 1, 2 (D.C. Cir. 2011) (per curiam).   It is therefore "important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage of correlation to the claimed ground of discrimination.   Otherwise, the federal courts will become a court of personnel appeals."   *Bryant v. Brownlee*, 265 F. Supp. 2d 52, 63 (D.D.C. 2003), quoting *Alfano v. Costello*, 294 F.3d 365, 377 (2d Cir. 2002).

Ward fails to make the requisite showing in several ways.   First, there is no evidence that the actors said or did anything that would directly connect their actions to a retaliatory motive. Ward claims that one of her coworkers, Rosetta Clarke, told her that she had been given instructions to "go after" Ward.   Pl.'s Opp. at 20, citing Pl.'s Dep. at 95:16–96:22.   But even if the Court gives full credence to this unsubstantiated piece of hearsay, Clarke's statement does not give any indication of why she was told to go after Ward, much less affirmatively indicate that the reason was retaliation.   Ward also points to an allegation in her amended complaint that Sharon White-Pulley once told her that she "would not go anywhere in the Agency because [she] talked too much about management's policy violations."   *See* Pl.'s Opp. at 20, citing Am. Compl. ¶ 19.   But plaintiff has not submitted any evidence of this comment; she merely cites an allegation in her amended complaint.   The Court cannot rely on allegations alone at the summary judgment stage.   *Garay v. Liriano* – F. Supp. 2d --, Civ. A. No. 11-1207, 2013 WL 1855742, at *14 (D.D.C. May 3, 2013) ("Allegations in a complaint are decidedly not evidence and cannot be relied on by the Court in ruling on [a motion for summary judgment].").

The names that Ward claims White-Pulley called her – "mini-me," "baldy," and "big mouth" – do not on their face reflect animus for Ward's filing of discrimination complaints, but instead reflect a poor working relationship between White-Pulley and Ward.  This personal animosity between the two women is further reflected in the emails between other employees complaining about White-Pulley's treatment of Ward.  *See* Email from Angela Burns to Keith Wheeler (July 6, 2006), Ex. 3 to Pl.'s Opp. (stating that she felt uncomfortable about comments that Ms. White-Pulley made to her, including "[s]he repeatedly called Mrs. Ward 'mini me' and put her down.  Mrs. White made it very clear that she and Mrs. Ward do not get along."); Email from Veronica Joyner to Nathaniel Williams (November 7, 2006), Ex. 4 to Pl.'s Opp. (stating that she heard Ms. White say, "Nobody but that bald head Ms. Ward said something"); *see Dudley v. WMATA*, -- F. Supp. 2d --, Civ. A. No. 11-1447, 2013 WL 617024, at *26 (D.D.C. 2013) ("A litany of cases shows that simply having a rude, harsh, or unfair boss is not enough for a hostile work environment claim.").  And even if the Court were to find that the phrase "big mouth" could refer to Ward's voicing of complaints, that alone is not a sufficient basis for a reasonable jury to find that all of the actions Ward has invoked were taken for a retaliatory purpose.  *See Jones v. Billington*, 12 F. Supp. 2d 1, 12 (D.D.C. 1997) (finding that the plaintiff failed to demonstrate that the hostile conduct he complained of related to his race where only two incidents mentioned or related to race).  So the employment actions were not expressly retaliatory on their face.

Second, although the facial neutrality of an action does not necessarily bar a Title VII claim, the plaintiff must at least "demonstrate that there is a factual basis for inferring that the incidents were motivated by a retaliatory animus."  *Mason*, 811 F. Supp. 2d at 180.  Ward has not satisfied even that minimum requirement.  Ward's support for her theory that these actions

were motivated by retaliation consists almost entirely of conclusory allegations from her own deposition testimony. *See* Pl.'s Dep. at 113:21–120:1 ("It is – what I'm saying is that she did these things for Mr. McInnis because of my complaint against him."); *id.* at 116:17–:21 ("She talked to me to harass me, to have me working in a hostile work environment because she didn't – she didn't like the fact that I made a complaint against Mr. McInnis."); *id.* at 105:2, 109:15 (when asked why she believed that the reason she was denied a promotion was because of her complaint, Ward responds "because it's true"); *id.* at 104:4–:12 ("Q:  Okay, do you believe that when [you were required to work shifts longer than eight hours] it was related in any way to your complaints about Mr. McInnis's inappropriate comments?  A:  Yes, I do.  Q:  Okay, and why do you believe that?  A:  Because it's true.  Q:  Any other reasons?  A:  Because it's true."). Self-serving conclusory assertions by the plaintiff about a co-worker's retaliatory motives are not sufficient to sustain a claim for retaliatory hostile work environment at the summary judgment stage. *See Hussain v. Nicholson*, 435 F.3d 359, 365 (D.C. Cir. 2006).

And although plaintiff claims that other similarly situated individuals were not subjected to some of the negative treatment that she was, she again provides no *evidence*. Her claim that similarly situated employees were permitted to work overtime while they were on light-duty assignments, Pl.'s Opp. at 21, is founded entirely on her own deposition testimony in which she conclusorily claims that she believes she was not given overtime work because of her complaints about Mr. McInnis's conduct, *see id.*, citing Pl.'s Dep. at 80:17–23, 104:19–22, and an unattributed list of "Fall 2012 Draft Exemptions and Schedule Adjustment" attached to her own affidavit. And although she claims that other similarly situated DYRS employees were given more support in their work assignments, this allegation is also based only on a conclusory assertion in her own affidavit. Pl.'s Opp. at 21, citing Pl.'s Aff., Ex. 5 to Pl.'s Opp. [Dkt. # 38-5]

¶ 5 ("Other similarly situated DYRS employees were not assigned to work alone with the youth.").  These bits of hearsay are not adequate to support a claim at the motion for summary judgment stage.  *See Greer v. Paulson*, 505 F.3d 1306, 1315 (D.C. Cir. 2007) ("[S]heer hearsay . . . counts for nothing on summary judgment.") (internal quotation marks omitted).

Furthermore, Ward does not point to facts that could give rise to an inference of retaliatory motive; for instance, she does not show temporal proximity between her complaints and the complained of actions.[16]  Ward provides very few details about the timing of either her complaints or the alleged retaliatory actions, and of the actions that can be placed within a timeframe, the earliest began in July 2006.  *See* Email from Angela Burns to Keith Wheeler (July 6, 2006), Ex. 3 to Pl.'s Opp. (reporting that during a conversation, White-Pulley repeatedly referred to Ward as "mini me," put her down, and "made it very clear that she and Mrs. Ward do not get along").  That is nearly six months after she first complained to management about McInnis in December 2005.  Pl.'s Answers to Interrogs. at 2.  Even at the *prima facie* stage, courts in this district generally require closer temporal proximity in order to establish causation in the absence of direct evidence.  *See Harris v. D.C. Water and Sewer Auth.*, -- F. Supp. 2d --, Civ. A. No. 12-1453, 2013 WL 518641, at *4 (D.D.C. Feb. 13, 2013) (summarizing the precedent to show that courts in this district have rejected intervals of two and a half months, three months, five months, and ten months as establishing temporal proximity).  And although Ward claims to have filed numerous other complaints with her supervisors, Pl.'s Dep. at 101:10–

---

16      The Court notes that temporal proximity alone would be insufficient to demonstrate a retaliatory motive at the summary judgment stage. *See Talavera v. Shah*, 638 F.3d 303, 313 (D.C. Cir. 2011) ("Although an adverse action that occurs shortly after protected activity can be part of a finding of retaliation, positive evidence beyond mere proximity is required to defeat the presumption that the proffered explanations are genuine[.]") (citations and internal quotation marks omitted).  The Court raises the lack of temporal proximity here only to demonstrate that plaintiff has not produced any evidence of retaliatory motive for the actions in question.

:16; Pl.'s Answers to Interrogs. at 11, she offers no evidence of when those complaints were lodged.  So the Court has no way to determine whether the hostile actions were in close temporal proximity to her other complaints.[17]

In sum, even if the Court were to decide that a reasonable jury could find that Ward has presented evidence of the sort of severe and pervasive hostility that could alter the conditions of Ward's work environment – which she has not – no reasonable jury could find that any of these actions were motivated by retaliatory animus.

## II.    Ward's gender hostile work environment claim fails as a matter of law.

As a preliminary matter, the Court notes that both Counts II and III of the amended complaint allege hostile work environment claims based on Ward's gender, even though Count II is styled "hostile work environment" and Count III is styled "gender discrimination and sexual harassment."  *See* Am. Compl. ¶¶59–92.  Moreover, Ward herself construes the amended complaint as asserting only two claims:  one for hostile work environment based on gender, and one for hostile work environment based on retaliation.  *See* Pl.'s Opp. at 17–25 (separating analysis section into two substantive subsections:  (1) "Plaintiff has established material facts in dispute in her hostile work environment claim based on her sex"; and (2) "Plaintiff has established material facts in dispute in her hostile work environment claim based on reprisal.");  Pl.'s Opp. at 18 (citing the paragraphs of the amended complaint that make up both Counts II

---

17    The only indication of proximity comes from Ward's October 20, 2009 email to Vincent Schiraldi complaining that she was reassigned by Watch Commander Sharon Pulley two days after submitting a written complaint to Schiraldi.  Ex. 12 to Pl.'s Opp.  The Court notes that Ward has not submitted a copy of the complaint itself to the Court.  Moreover, there is no indication that Pulley was even aware of Ward's complaint to Schiraldi at the time that she reassigned Ward.  *See Laboy v. O'Neill*, No. 01-5322, 2002 WL 1050416, at *1 (D.C. Cir. Mar. 13, 2002), citing *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 270–71 (2001) (upholding the district court's grant of summary judgment to the defendant in a Title VII retaliation case partly because the official responsible for ordering the adverse action was unaware of the plaintiff's prior protected activity).

and III, Am. Compl. ¶¶ 59–92, for the proposition that "[h]ere, Plaintiff is asserting a sexual harassment hostile work environment claim"); Pl.'s Opp. at 25 ("Ultimately, this case boils down to whether Plaintiff was subjected to a hostile work environment based on her sex and engagement in protected EEO activity."). Accordingly, the Court will consolidate its treatment of Counts II and III into a single discussion of whether Ward has come forth with sufficient evidence to support a claim for hostile work environment based on gender.

Ward argues that she was subjected to a hostile work environment based on the sexual harassment she experienced in the workplace. Pl.'s Opp. at 18 ("Here, Plaintiff is asserting a sexual harassment hostile work environment claim."). To survive summary judgment, a plaintiff asserting a sexual harassment hostile work environment claim, like all hostile work environment claims, must demonstrate that a reasonable jury could find the sexual harassment to be severe or pervasive. *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 752 (1998). Ward has not satisfied that burden here.

The only evidence of sexual harassment that Ward has provided is her testimony that her supervisor, Jeffrey McInnis, made lewd comments to her on two occasions in December 2005 when he triggered the metal detector that she was operating: (1) "it must be the metal in my drawers," Pl.'s Dep. at 44:18–45:3; Pl.'s Answers to Interrogs. at 3, and (2) "I want you to use your hands and pat me down," Pl.'s Dep. at 45:4–:12; Pl.'s Answers to Interrogs. at 3.[18] First, the "mere utterance of an epithet which engenders offensive feelings in an employee does not sufficiently affect the conditions of employment to implicate Title VII." *Harris*, 510 U.S. at 21,

---

18    Ward's opposition to the motion for summary judgment makes clear that these are the only actions she attributes to discrimination on the basis of gender and that she attributes all of the other alleged hostile actions to retaliation. *Compare* Pl.'s Opp. at 17–19 (under subheading "Plaintiff has established material facts in dispute in her hostile work environment claim based on her sex") *with* Pl.'s Opp. at 19–25 (under subheading "plaintiff has established material facts in dispute in her hostile work environment claim based on reprisal").

quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57 (1986) (alteration omitted) (internal quotation marks omitted).  So the mere fact that these comments were sexual in nature does not mean that they are actionable.  Rather Ward must establish that the sexual harassment was severe and pervasive, *Burlington*, 524 U.S. at 752, which she fails to do here.  These comments are not physically threatening or physically humiliating, and there is no evidence that they interfered with Ward's work performance.  *See Bergbauer v. Mabus*, -- F. Supp. 2d --, Civ. A. No. 09-1032, 2013 WL 1245944, at *12 (D.D.C. 2013) ("In our circuit, even multiple instances of physical contact and sexual advances may not be sufficient to meet the demanding legal standard for a hostile work environment.  Furthermore, incidents involving only verbal comments, particularly by co-workers, must generally be quite pervasive and severe to be actionable.").

Moreover, the comments appear to be isolated incidents.  There is no evidence that McInnis or any of Ward's supervisors made any other sexually suggestive comments or engaged in sexual harassment of any kind.  *See Douglas-Slade v. LaHood*, 793 F. Supp. 2d 82, 101 (D.D.C. 2011) ("Isolated incidents do not form a hostile work environment claim."); *see also George v. Leavitt*, 407 F.3d 405, 416–17 (D.C. Cir. 2005) (finding no pervasive hostility when the plaintiff was told to "go back where she came from" on three separate occasions).  Plaintiff relies on a case from the Ninth Circuit for the proposition that the mere continuing presence of a person who has engaged in harassment against the plaintiff in the past can create a hostile work environment.  *See* Pl.'s Opp. at 20.  That court, however, expressly qualified its holding by stating that the harassment must have been "particularly severe or pervasive" for the harasser's mere presence to alone support the hostile work environment claim.  *Ellison v. Brady*, 924 F.2d 872, 883 (9th Cir. 1991).  While McInnis's comments were entirely inappropriate for the

workplace, plaintiff has not demonstrated, or even alleged, that he engaged in the severe or pervasive sexual harassment that could support a hostile work environment claim on this theory.

The Court will therefore grant summary judgment for the District on Ward's gender-based hostile work environment claims (Counts II and III).

### CONCLUSION

Accordingly, the Court will grant the District of Columbia's motion for summary judgment.  A separate order will issue.

AMY BERMAN JACKSON
United States District Judge

DATE:  June 14, 2013